In the Matter of WILLOWBROOK ASSOCIATES, INC., et al., Appellants,

v FINANCE ADMINISTRATOR OF THE CITY OF NEW YORK et al., Respondents.—
In a consolidated proceeding to review certain real property tax assessments
for the tax years 1972/1973 through 1975/1976, petitioners appeal from a
judgment of the Supreme Court, Richmond County, dated August 16, 1977,
which, *inter alia,* confirmed the assessments for the years under review.
Judgment reversed, on the law and the facts, with costs, and it is directed
that petitioners have judgment reducing the subject assessments for each of
the years in question to a total of $1,300,000 (land: $220,000; building:
$1,080,000). The subject property is improved with eight garden-type apart-
ment structures containing 164 apartments with a total of 495 rooms. The
improvements were completed during 1968 and 1969 and certificates of
occupancy were issued in January, 1971, approximately one year before the
tax status date for the first year under review. Each building is provided
with paved outdoor parking areas for its residents and visitors; heating is
supplied by 34 small boilers servicing separate sections of each of the eight
structures; all interior public spaces are carpeted; window screens are
supplied to all tenants; air conditioning is provided by individual wall-
inserted units. The property was assessed as follows for the years under
review:

| TAX YEAR | LAND | BUILDING | TOTAL |
|---|---|---|---|
| 1972/73 | $217,000 | $1,187,000 | $1,404,000 |
| 1973/74 | 220,000 | 1,230,000 | 1,450,000 |
| 1974/75 | 220,000 | 1,230,000 | 1,450,000 |
| 1975/76 | 209,000 | 1,230,000 | 1,439,000 |

The respective experts appraised the property as follows:
Joseph P. Walsh — Petitioners' Expert

| YEAR | LAND | BUILDING | TOTAL |
|---|---|---|---|
| 1972/73 | $217,000 | $1,053,808 | $1,270,808 |
| 1973/74 | 217,000 | 1,015,570 | 1,232,570 |
| 1974/75 | 220,000 | 976,635 | 1,196,635 |
| 1975/76 | 220,000 | 949,098 | 1,169,098 |

Stanley Siebert — Respondents' Expert:

| YEAR | LAND | BUILDING | TOTAL |
|---|---|---|---|
| 1972/73 | $280,000 | $1,520,000 | $1,800,000 |
| 1973/74 | 280,000 | 1,520,000 | 1,800,000 |
| 1974/75 | 280,000 | 1,520,000 | 1,800,000 |
| 1975/76 | 280,000 | 1,520,000 | 1,800,000 |

Both experts used the income approach, petitioners' using the building
residual technique, with a capitalization rate of 10½% for the land and
12½% for the improvements, the latter rate consisting of 10½% "for return
on improvements" and 2% for "allowance for recapture (50 year life)".
Respondents' expert used an over-all capitalization rate of 9.75%. Special
Term stated that it "afforded significant weight to the actual income and
expenses submitted by respondent *[sic]* in its Exhibit 'A'." In evaluating that
exhibit, however, Special Term eliminated certain items of claimed expense

and made allowances for others. The court derived its own calculations of net income and then made further calculations, as follows:

| "TAX YEAR | NET INCOME | TOTAL ASSESSED VALUATION | RETURN INCLUDING TAX RATE(%) | TAX RATE (%) | RETURN TO OWNER(%) |
|---|---|---|---|---|---|
| 1972/73 | $272,418 | $1,404,000 | 19.4 | 6.519 | 12.881 |
| 1973/74 | 282,095 | 1,450,000 | 19.4 | 6.908 | 12.492 |
| 1974/75 | 245,326 | 1,450,000 | 16.9 | 7.353 | 9.547 |
| 1975/76 | 262,342 | 1,439,000 | 18.2 | 8.187 | 10.547" |

Special Term concluded: "The court finds a fair overall return to the subject owner for each of the tax years under review, to be 9-½%. Accordingly, all the assessments for Land and Improvements for each of the tax years under review are confirmed." In our opinion, Special Term erred in four respects.

I

Petitioners' expert estimated that the buildings had a 50-year life. Both experts realized, however, that certain items used in connection with the buildings would have a shorter life than the buildings. Thus, petitioners' expert estimated that the 164 air conditioners would have a five-year life span, whereas respondents' expert estimated a 12½ year life. Petitioners' expert estimated that the 162 gas ranges would have a life span of nine years; respondents' expert's estimate was 18 years. Both agreed that specific allowances should be made in the estimated expenses for the cost of replacing stoves, refrigerators, air conditioners, and for both interior and exterior painting. Since none of these replacement expenses had yet been incurred during the calendar years under review by virtue of the newness of the buildings, both experts recognized that it was necessary and proper to anticipate and amortize those costs on an annual basis. Their allowances were as follows:

| | Walsh (Petitioners) | Siebert (Respondents) |
|---|---|---|
| Refrigerator/Stoves | · $ 6,859 | $2,475 |
| Air Conditioners | 5,576 | 1,771 |
| Painting | 2,858 | 4,691 |
| | $15,293 | $8,937 |

Special Term erred in disregarding both experts and making no allowance for any of these costs.

II

Furthermore, there were five additional cost items not appearing in the actual expenses which both experts agreed also required allowance in some form, since they also depreciated faster than the building itself and therefore required intermittent replacement during the life of the building. However, while they agreed on that principle, they did not agree how the allowances for those five particular items should be made. Mr. Walsh, the petitioners' expert, tabulated the following specific deductions in his report,

after stating their respective unit costs and full costs together with their separate useful lives:

|  | Annual Deduction |
|---|---|
| Carpeting | $ 2,100 |
| Window Screens | 1,100 |
| Parking Area Paving | 2,280 |
| Roof Replacements | 2,900 |
| Small Heating Boilers | 6,800 |
|  | $15,180 |

In contrast, the respondents' expert, Mr. Siebert, who had given specific computations for his range, refrigerator, air conditioner, and painting reserves, offered no specific figures on any of these five additional expense items. Significantly, he agreed that each item called for some allowance in the process whereby net income is determined and translated into capital value. His method was to include those allowances for all five items in some lump-sum manner in his 9.75% over-all capitalization rate. However, he could not explain how he had accomplished this, nor could he state the amount or rate of all or any of his allowances. We agree with petitioners' contention that "His [Siebert's] inability to do so of course impaired the credibility of his method, but it still left the significant admission that each of these five expense items required allowance in some form." Special Term erred in making no allowance for these five expense items. Petitioners argued that "Since the only evidence in the record specifying just what those allowances should be, was that of the petitioner's [sic] expert as tabulated above, it should have been adopted by Special Term instead of being totally disregarded." We note that "a trier of facts is not bound by opinion testimony, even when uncontradicted" (see Matter of City of New York [A. & W. Realty Corp.], 1 NY2d 428, 432). At bar however, there was no discernable reason for Special Term not to adopt the subject figures of petitioners' expert.

### III

Although petitioners' expert employed a capitalization rate of 12½% for the buildings and 10½% for the land, and respondents' expert employed an over-all capitalization rate of 9.75%, Special Term concluded that 9.5% afforded a fair return. The court did not, however, explain why it applied a rate lower than that of both experts. We conclude that on this record, the 9.5% "fair return" standard applied by Special Term was "predicated solely and simply on the subjective judgment of * * * [the] court, without any basis in the evidence" (see Matter of City of New York [A. & W. Realty Corp.], supra, p 432). Thus, as in Matter of City of New York (A. & W. Realty Corp.) (supra, p 433), "the conclusion is inescapable that that court [the Appellate Division] substituted capitalization rates, based on its own subjective collective mind, for those testified to by the experts." The Court of Appeals in that case accordingly directed that the order of the Appellate Division be reversed and the decree of Special Term reinstated. Similarly, in Matter of Zipel Realty Corp. v Finance Admin. (69 AD2d 837, 838) we reversed and ordered a remand because of various errors, among which was the fact that we were "uncertain of the basis in the record for the conclusion that 7½% represents a 'fair' rate of return for the land."

## IV

Special Term's decision states that from the schedule of actual income and expenses submitted by respondents in Exhibit "A", the court eliminated, *inter alia*, the item of "depreciation". Thus, the court eliminated this item for the purpose of computing *net income.* The court failed, however, to indicate what allowance for depreciation of the buildings, if any, it had included in its 9.5% over-all *capitalization rate.* In *Matter of Zipel Realty (supra,* p 838), we reversed and remanded for further proceedings because, *inter alia,* we noted "that the capitalization rate for buildings employed by Special Term makes no apparent provision for a recapture rate and we are unable to discern what provision, if any, Special Term made for recapture in its determination of value."

### CORRECTIVE ACTION

We are in accord with petitioners that there is sufficient evidence in the record for this court to make new findings rather than order a time-consuming and expensive remand, and that at bar, justice is best served by that procedure. Petitioners' brief accurately, concretely and specifically sets forth and organizes the necessary data from the record, and petitioners make certain concessions, all of which justify the proposed modified findings set forth by petitioners and obviate the need for a remand.

### NEW FINDINGS

*Net Income Adjustments:* Special Term's "Net Income" figures are accordingly reduced to allow for the expense deductions of $8,937 conceded by the city's own expert for replacement of stoves, refrigerators, air conditioners and for interior and exterior painting, and further reduced to allow for the expense deductions totaling $15,180 estimated by the petitioners' expert for prorated cost of replacing carpeting, window screens, parking area paving, roofs, and heating boilers, and agreed to in principle by the respondents' expert. Thus Special Term's "Net Income" figures are reduced by a total of $24,117 each year to:

| | | |
|---|---|---|
| $248,301 | for | 1972/73 |
| 257,978 | for | 1973/74 |
| 221,209 | for | 1974/75 |
| 238,225 | for | 1975/76. |

*Corrected Capitalization Rate:* Petitioners correctly recognize "that although 2% is the only specific rate of depreciation herein, it cannot merely be added either to Special Term's 9.5% overall rate or to the 9.75% overall rate of respondent's *[sic]* expert, since the 2% factor relates only to the building component." Petitioners' solution is reasonable and is adopted: "However, it is possible to determine with reasonable accuracy the portion of 2% which should be added to those overall rates. This can be done simply by employing the rates between building and total values demonstrated by the entire record, to wit, the assessed values as well as the appraised values of both experts. According to all of these valuations, the building portion represents 81 to 84 percent of total value, whatever that value may be. The lowest, to wit, 81 percent, is most favorable to the City. Accordingly, if 2% is the correct depreciation rate for the building alone, 81 percent of 2% is 1.62%, which may fairly and reasonably be added to the overall rate herein. Since Special Term's 9.5% overall rate was without any basis in the record, it is 9.75%, the respondent's *[sic]* overall rate, to which 1.62% should be

added in order to establish the minimum correct rate at which the net income herein should be capitalized. Thus, the capitalization rate required by the record herein becomes 11.37%. It is not without significance that this is remarkably close to the rates of 10.5% for land and 12.5% for building employed by the petitioner's *[sic]* expert." *Modified Valuations:* Applying that 11.37% rate to Special Term's net income, with the required adjustments previously shown, results in the following values:

| SPECIAL TERM'S ERRONEOUS FINDING OF NET INCOME | SPECIAL TERM'S MINIMALLY ADJUSTED NET INCOME | IF CAPITALIZED AT 11.37% PLUS TAX RATE |
|---|---|---|
| $272,418 | $248,301 | $1,388,000 |
| 282,095 | 257,928 | 1,412,000 |
| 245,326 | 221,209 | 1,180,000 |
| 262,342 | 238,225 | 1,220,000. |

We average the above at $1,300,000 for each year, and allocate $220,000 for land and $1,080,000 for buildings. This averaging (as noted by petitioners) favors the city because petitioners' valuations showed a downtrend whereas the city's expert reported constant values. Judgment should be entered in accordance with our findings. Damiani, J. P., Lazer, Gibbons and O'Connor, JJ., concur.